## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SHELDON HUDSON,

       Plaintiff,

    vs.                           CIVIL NO. 11-522 JB/CEG

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** comes before the Court on Plaintiff Sheldon Hudson's *Motion to Reverse or Remand Decision of the Commissioner and Brief in Support Thereof*, (Doc. 26), and Defendant's *Response to Plaintiff's Motion to Reverse or Remand*, (Doc. 28). Plaintiff did not file a reply to Defendant's response and the time for doing so has passed.

Sheldon Hudson is a forty-seven year old man who applied for Social Security Disability Benefits on July 30, 2008. Administrative Record ("AR") at 100. He alleges that he has been disabled since March 2, 2008, because of several mental impairments. *Id.* at 16. Administrative Law Judge ("ALJ") Ann Farris denied his application for benefits on February 26, 2010. *Id.* at 23. Mr. Hudson contends that the ALJ's assessment of his Residual Functional Capacity ("RFC") was improper because she failed to credit his testimony and his mother's testimony regarding his mental limitations. (Doc. 26 at 9-12). He further argues that the ALJ failed to appropriately weigh the opinions of two treating doctors in finding that Mr. Hudson was not disabled. (*Id.* at 12-15). Defendant contends that the ALJ correctly weighed the testimony presented by Mr. Hudson and his mother and that the ALJ's RFC determination was supported by substantial evidence. (Doc. 28 at 4-12).

Having considered the parties' filings, the relevant law, and having meticulously

reviewed and considered the entire administrative record ("AR"), the Court finds that the ALJ failed to apply the correct legal standards in Mr. Hudson's' case. Therefore, the Court **RECOMMENDS** that Mr. Hudson's *Motion to Reverse or Remand* be **GRANTED**.

## I.    Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760. An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. While a court may not re-weigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the

evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II.   Applicable Law and Sequential Evaluation Process

For purposes of disability insurance benefits (DIB) and supplemental security income (SSI), a person establishes a disability when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 405.1505(a), 416.905(a).

In light of this definition for disability, a five-step sequential evaluation process (SEP) has been established for evaluating a disability claim.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the SEP, the claimant has the burden to show that:  (1) he is not engaged in "substantial gainful activity." At the second step, the claiming must show that (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) his impairment(s) either meet or equal one of the "Listings"[1] of presumptively disabling impairments; or (4) he is unable to perform his "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.  At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience.  *Grogan*, 399 F.3d at 1261.

---

[1] 20 C.F.R. pt. 404, subpt. P, app. 1.

III.   **Background**

     a.   **Medical Background pre-2008**

Mr. Hudson is a forty-seven year old man who worked several different jobs into his 40's, including that of stock clerk, cashier, and liquor store manager. AR at 47-48. Symptoms of a mental disorder began to manifest themselves in September of 2006, when he was hospitalized overnight at the Kaseman Emergency Room for an episode of depression with psychotic features. *Id.* at 209, 213. Mr. Hudson was prescribed Risperdal[2] and Fluoxetine[3] and was advised to seek outpatient mental health counseling. *Id.* at 209, 213-14. Mr. Hudson followed up with Dr. Amy Robinson at Presbyterian Healthcare Services where he reported that the Risperdal was helping him stay clam and sleep better and that he was seeking counseling. *Id.* at 213.

Mr. Hudson began seeing a counselor at Christian Counseling of New Mexico in October of 2006. *Id.* at 231. He claimed to feel sad, hopeless, apathetic, and paranoid. *Id.* at 231-32. He was having trouble sleeping at night but claimed that the medications prescribed by Dr. Robinson helped and improved his energy level. *Id.* at 231 His counselor described his mood and affect as anxious but his insight and speech to be adequate. *Id.* at 235-36. His symptoms did "not classically fit into any particular depressive or bipolar diagnosis" and so he was diagnosed with a mood disorder, not otherwise specified. *Id.* at 236. His global assessment of functioning ("GAF") score was 65. *Id.*[4]

---

[2]  Risperdal is an antipsychotic drug frequently used to treat mental illnesses such as schizophrenia and bipolar disorder. *See* United States National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000944/.

[3] Fluoxetine, better known as Prozac, is a drug used to treat mental illnesses such as depression and obsessive compulsive disorder. *See* United States National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000885/.

[4] The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagonostice*

Mr. Hudson attended several more counseling sessions at Christian Counseling between October 2006 and February 2007. During these visits he was generally described as stable and normal though he complained of occasional depression and paranoid thoughts. *Id.* at 227-230. Mr. Hudson stopped attending counseling sessions in February of 2007 and did not seek any other medical treatment for his mood disorder for almost a year and a half. *Id.* at 19, 225.

### b.   Medical Records post-2008

Mr. Hudson returned to Christian Counseling in July of 2008. Mr. Hudson was accompanied by his mother and she explained that Mr. Hudson had moved back in with her because his symptoms had worsened dramatically and he was not functioning. *Id.* at 225. She stated that he had stopped taking his medications about a year prior and that she had started mixing the medication into his food. *Id.* Dr. Sievert, the reviewing physician, found Mr. Hudson to be disheveled, irritable, and "more disorganized [when] off his medications." *Id.* at 226. He prescribed Abilify instead of Risperdal and continued the Fluoxetine.[5] *Id.* at 183-84. Mr. Hudson followed up in September and October of 2008 and Dr Sievert found that he was doing better with the Abilify, noting that he did not experience moodswings or paranoia so long as he took his medication. *Id.* at 184-87. Dr. Sievert nevertheless wrote a letter stating that, in his opinion, Mr. Hudson was incapable of working due to his delusional disorder. *Id.* at 220.

---

*and Statistical Manual of Mental Disorders* 32 (Text Revision 4th ed. 2000) (*DSM-IV*). A GAF score of 61-70 indicates "mild symptoms or some difficulty in social, occupational, or school functioning." *Id.* at 34. A GAF score in the mid-60's indicates that the patient is "generally functioning pretty well." *Id.*

[5] Abilify is used to treat symptoms of schizophrenia and bipolar disorder. *See* United States National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221/.

Because he had applied for social security disability benefits, Mr. Hudson was evaluated by several doctors on behalf of New Mexico's Disability Determination Services ("DDS") in the fall of 2008. Mr. Hudson was first seen by Dr. Louis Wynne in September of 2008. *Id.* at 259. Mr. Hudson's mother accompanied him to the appointment and Dr. Wynne found him to be alert with unimpaired judgment and possessive of average intelligence. *Id.* at 259-60. Dr. Wynne diagnosed him with cognitive disorder, not otherwise specified, and delusional disorder. *Id.* at 261. Dr Wynne ran a series of cognitive tests and determined that Mr. Hudson could read and understand basic instructions and that his ability to persist at work tasks was no more than mildly impaired. *Id.* Dr Wynne perceived no interactive limitations but nevertheless assessed Mr. Hudson's GAF score at 45. *Id.* at 261-62. A GAF score of 45 indicates serious symptoms or serious impairment in social or occupational functioning. DSM IV at 34.

Dr. Ralph Robinowitz, a non-examining state agency physician, reviewed Mr. Hudson's medical records in September of 2008. *Id.* at 195. He diagnosed Mr. Hudson with delusional disorder and cognitive disorder, not otherwise specified. *Id.* at 195-96. Dr. Rabinowitz completed a mental residual capacity assessment wherein he opined that Mr. Hudson had no difficulty understanding or remembering simple instructions but that he was markedly limited in his ability to understand and carry out complex instructions. *Id.* at 189. He was mildly limited in his ability to maintain attention and concentration and to maintain socially appropriate behavior. *Id.* at 189-90, 204. He concluded that Mr. Hudson "can understand, carry out, and complete routine simple instructions without interference from psychological symptoms." *Id.* at 191.

While Mr. Hudson was being evaluated by DDS physicians, he and his mother continued to seek treatment for his symptoms. Mr. Hudson was referred to

neuropsychologist Dr. Baljinder Sandhu at Presbyterian Healthcare Services in January of 2009. *Id.* at 210-11, 242. Mr. Hudson's mother told Dr. Sandhu that her son was very delusional, had extremely poor memory, and could not even accomplish simple tasks. *Id.* Dr. Sandhu found that Mr. Hudson performed well on the Mini-Mental Status Exam and showed good reasoning ability. *Id.* at 243, 245.

Mr. Hudson did not see Dr. Sandhu again and began receiving treatment from Dr. Fazal Khan at Presbyterian Healthcare Services. *Id.* at 267. Dr. Khan was responsible for overseeing Mr. Hudson's medication management and they met every 3 months. *Id.* at 290. Dr. Khan diagnosed him with psychotic disorder, not otherwise specified and found his cognition to be impaired. *Id.* at 266. In March of 2009, Dr. Khan described Mr. Hudson as disheveled and withdrawn with a flat affect. *Id.* at 267. He assessed his GAF score at 55. A GAF score of 55 indicates moderate symptoms or moderate difficulty in social or occupational functioning. DSM IV at 34. Dr. Khan's subsequent visits with Mr. Hudson indicated some gradual improvement. *Id.* at 295, 318. Dr. Khan continued to list Mr. Hudson's GAF in the mid-50's range. *Id.*

Dr. Khan completed a medical source statement for Mr. Hudson in October of 2009. *Id.* at 326. The evaluation stated that Mr. Hudson experienced repeated episodes of decompensation which exacerbated his symptoms or caused him to withdraw emotionally. *Id.* He found Mr. Hudson to be markedly limited in his ability to understand and carry out detailed instructions and to concentrate for extended periods of time. *Id.* He was markedly limited in his ability to adhere to a schedule and to work or interact appropriately with coworkers, supervisors, or the public *Id.* at 326, 328. Dr. Khan found marked restrictions in daily living activities and extreme difficulty in maintaining social functioning. *Id.* at 327. Despite the grim assessment, Dr. Khan continued to score Mr. Hudson's GAF at 57, which

indicates only moderate symptoms or difficulties in social functioning. *Id.*

Dr. Khan referred Mr. Hudson to Valencia Counseling Services where Mr. Hudson met with a social worker named Elizabeth Kessler several times. He reported symptoms of depression, high anxiety, and paranoia. *Id.* at 282. These symptoms manifested themselves when he was around groups of people. *Id.* He was described as being emotionally withdrawn with a moderately blunted affect. *Id.* at 284. He also appeared extremely anxious and was suffering from moderate-to-severe depression. *Id.* Ms. Kessler thought that Mr. Hudson would benefit from therapy. *Id.* at 282.

Mr. Hudson also met with a neuropsychologist, Dr. Sandra Montoya, on at least two occasions in March and April of 2009. *Id.* at 306-314.[6] She reviewed his medical and personal history. *Id.* With regard to his symptoms, Dr. Montoya related that Mr. Hudson could be irrational or argumentative when not taking his medications but that the medications helped "even[ ] him out." *Id.* at 307, 309, 314. She noted that his thought process was disorganized and that his mother had to prompt him to maintain basic hygiene. *Id.* at 306. Dr. Montoya completed a medical source statement in August of 2009 wherein she opined that Mr. Hudson "can work only with close supervision and on tasks that do not involve interaction with the public or require complex tasks." *Id.* at 303. She further stated that Mr. Hudson could only work for two hours a day. *Id.*

     **c.**   **Hearing Before ALJ**

Mr. Hudson appeared before ALJ Farris on December 1, 2009, in Albuquerque. *Id.* at 29. He was accompanied by his mother and was assisted by Catalina Cordoba, a non-

---

[6] The parties occasionally refer to Dr. Montoya as Dr. Montago. (*See, e.g.*, Doc. 26 at 12-13; Doc. 28 at 9-11). However, Mr. Hudson's non-attorney representative clearly referred to her as Dr. Montoya and internet searches confirm that Dr. Montoya is a neuropsychologist practicing in Albuquerque. AR at 305; http://www.everydayhealth.com/doctors/dr-sandra_l_montoya_lp_phd-1434214.

attorney representative. *Id.* A vocational expert ("VE") named Karen Provine was present and testified as well. *Id.* at 29-30. Mr. Hudson told the ALJ that he hadn't worked since his alleged onset date of March 2, 2008. *Id.* at 34. He testified that his social phobia was the most significant impediment to him working. *Id.* at 36. He gets nervous and suffers panic attacks when he's around groups of people because he hears voices and thinks that people are talking about him. *Id.* at 37. He has trouble concentrating or focusing and frequently forgets to take his medications or take care of his personal hygiene. *Id.* at 43-44. He said that the medications help somewhat but that Dr. Khan is still trying to find the right dosage for him. *Id.* at 36. The medication does not alleviate his nervousness or panic attacks. *Id.*

He lives with his mother and stepfather and does periodic maintenance work on their house and rental properties. *Id.* at 35. Although he drives several times a month, he does not do so in the city. *Id.* at 38. He relies on his mother to do his grocery and clothes shopping. *Id.* at 39. He cooks occasionally but mostly stays in his room and stares at the wall. *Id.* at 39-41. He finds it difficult to sleep because he hears voices in his head through the night and will wake up two or three times.  *Id.* at 42-43.

Mr. Hudson's mother then testified that her son has been living with her for two years and that his symptoms had become increasingly severe over that time. *Id.* at 46. She stated that he had become increasingly paranoid and incapable of remembering how to take care of himself and that he panics when strangers or even other family members are around. *Id.* He runs upstairs and hides in his room when strangers approach the house. She believes that his symptoms prevent him from working. *Id.* at 47.

The ALJ then posed a hypothetical question to the VE regarding Mr. Hudson's ability to work. He asked the VE to imagine a person with Mr. Hudson's education, age, and work history with the following restrictions: I) he can have no interaction with the public, ii) he can

have occasional interactions with coworkers, iii) he can perform simple and detailed tasks but not complex tasks and, iv) he requires close supervision. *Id.* at 49. Having considered those restrictions, the VE stated that he could still work as either a laundry folder or stone setter. *Id.* at 49-50.

### d.   ALJ's Decision

After considering Mr. Hudson's medical records, vocational history, and the hearing testimony, ALJ Farris decided that Mr. Hudson did not qualify for disability benefits. *Id.* at 14-23. The ALJ found that Mr. Hudson had the following severe impairments: depression with social phobia, adjustment disorder, and psychotic disorder, not otherwise specified. *Id.* at 16. The ALJ found that none of the impairments met the definition of a listed impairment at step three of the sequential evaluation process and therefore moved on to assess Mr. Hudson's residual functional capacity. *Id.* at 16-17.

The ALJ found that Mr. Hudson retained the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: i) he was limited to work that involves no interaction with the public and only occasional interaction with coworkers, ii) he was limited to work involving simple and detailed tasks but not complex tasks, and iii) he required close supervision. *Id.* at 17. The ALJ's RFC determination was an exact replica of Dr. Montoya's RFC assessment. *Compare* AR at 17 *with* AR at 303.

The ALJ summarized the hearing testimony and then contrasted the severity of Mr. Hudson's symptoms as described by Mr. Hudson and his mother against the evidence contained within the medical records. *Id.* at 18-20. She noted that, despite his brief hospitalization in 2006, he responded well to the Fluoxetine and soon stopped seeking medical treatment for approximately a year and a half. *Id.* at 19. Upon his return to

Christian Counseling and Presbyterian Health Services, he reported improvement in his symptoms once he was prescribed Abilify and had his dosage of Fluoxetine increased. *Id.* at 19-20. Moreover, the bulk of the medical records assessed Mr. Hudson's GAF in the 50-60 range, indicating only moderate symptoms. *Id.* at 19-21. Based on the apparent effectiveness of the new drug regimen prescribed at Presbyterian Health as well as the improvement noted by various treating sources, the ALJ found that Mr. Hudson's symptoms were not quite as debilitating as he or his mother described. *Id.*

In addition to the medical records, the ALJ relied on the mental health evaluation performed by Dr. Montoya. The ALJ gave great weight to Dr. Montoya's opinion that Mr. Hudson could still perform simple tasks so long as he received close supervision and was not required to interact with the public. *Id.* at 21. She rejected Dr. Khan's finding that Mr. Hudson was markedly or extremely limited in maintaining social functioning or activities of daily living because they were inconsistent with Dr. Khan's GAF scores indicating that Mr. Hudson was no more than moderately limited. *Id.* Based on the limitations supported by the record, the ALJ found that Mr. Hudson could perform his past relevant work as a stock clerk and was therefore not disabled. *Id.* at 21-22. In the alternative, she found that he retained the residual functional capacity to perform the jobs of cleaner/polisher, stone-setter, and laundry folder, as described by the VE. *Id.* at 22-23.

## IV.   Analysis

Mr. Hudson presents several objections to the ALJ's decision denying benefits. He claims that the ALJ's credibility determinations with regard to the hearing testimony were not supported by substantial evidence. (Doc. 26 at 9-12). He claims that the ALJ failed to apply the correct legal standards when she adopted Dr. Montoya's opinion and afforded it great weight. (*Id.* at 12-14). He also claims that the ALJ should not have rejected Dr.

Khan's opinion that he had marked or extreme limitations in activities of daily living and social functioning. (*Id.* at 14-15). Because the Court finds Mr. Hudson's argument with regard to the adoption of Dr. Montoya's opinion to be dispositive, the Court will address it first.

### a.   The ALJ Did not Apply the Correct Legal Standards in Adopting Dr. Montoya's Opinion.

Mr. Hudson claims that the ALJ erred when she gave great weight to Dr. Montoya's opinion that Mr. Hudson was capable of performing simple tasks so long as he received close supervision and did not have to interact with the public. (Doc. 26 at 12-14). He presents two main objections: i) the ALJ did not support her finding by discussing the factors which are supposed to guide an ALJ's consideration of medical source statements, and ii) the ALJ impermissibly ignored Dr. Montoya's finding that Mr. Hudson could only work two hours a day. (*Id.*).[7] Defendant contends that the ALJ properly explained her decision to substantially rely on Dr. Montoya's opinion and that the ALJ permissibly discounted the notation regarding the number of hours Mr. Hudson could work. (Doc. 28 at 9-11). The Court will address each argument in turn.

### b.   The ALJ did not Support her Decision to Adopt Dr. Montoya's Opinion.

Although the ALJ gave Dr. Montoya's opinion great weight, her treatment of Dr. Montoya's findings were incredibly brief. The ALJ merely stated,

> I have afforded great weight to the opinion of Sandra Montoya, Ph.D. who determined on August 20, 2009, that the claimant was able to work only with close

---

[7] Mr. Hudson also claims that it was not evident that Dr. Montoya had ever treated him because her records are handwritten and are unclear as to authorship. (Doc. 26 at 13-14). The Court need not address this objection in any detail. The disputed records immediately follow a note written by Mr. Hudson's non attorney representative wherein she states that Dr. Montoya is willing to testify on Mr. Hudson's behalf and then lists Dr. Montoya's contact information. AR at 305. The Court is satisfied that the records are actually those of Dr. Montoya.

supervision and on tasks that did not involve close interaction with the public or require complex tasks. I concur and adopt her opinion.

AR at 21. Mr. Hudson contends that an ALJ must provide more factual support when crediting a medical opinion and that ALJ Farris' adoption of Dr. Montoya's opinion did not comport with social security regulations.

When considering what weight, if any, to afford to a medical source opinion, ALJ's are instructed to consider the six factors established in 20 C.F.R. § 404.1527(d). These factors include, i) whether the source has personally examined the claimant, ii) the length of treatment, nature and extent of the treatment, iii) supportability of the opinion by reference to relevant evidence, iv) consistency of the opinion with the record as a whole, v) the source's medical specialization, and vi) any other factor which tends to support or refute the opinion. *Id.* While ALJ is not required to "apply expressly each of the six factors in deciding what weight to give a medical opinion," the ALJ's explanation must be "sufficiently specific to make clear to any subsequent reviewer the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *see also* SSR 96-2p (noting that an ALJ's decision to adopt or reject a medical source statement "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave . . . and the reasons for that weight.").[8]

In this case, the ALJ did not address any of the six 404.1527(d) factors in discussing

---

[8] Though social security rulings do not necessarily carry the force of law, they are entitled to deference. *See Fagan v. Astrue*, 231 F.App'x 835, 837 (10th Cir. 2007). Indeed, the particular strictures of SSR 96-2p have been explicitly endorsed by the Tenth Circuit in several opinions. *See Langley v. Barnhart*, 373 F.3d 1116, 1120 (10th Cir. 2004); *Watkins v. Barnhart*, 350 F.3d 1297 (10th Cir. 2003).

Dr. Montoya's opinion. Neither did she give a specific reason why she found Dr. Montoya's opinion to be persuasive. She did not state whether she found it to be consistent with other medical evidence in the record or claim that it was consistent with any personal observations she made of Mr. Hudson. As such, the Court is bound to find that the ALJ did not apply the correct legal standards in adopting Dr. Montoya's opinion. *See, e.g.*, *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003).

The Court notes that this error is not immaterial. Dr. Montoya's opinion was the only medical source opinion which was given great weight in the ALJ's opinion. The ALJ relied heavily on Dr. Montoya's opinion when formulating Mr. Hudson's RFC. In fact, Mr. Hudson's RFC assessment is practically a verbatim repetition of Dr. Montoya's medical source statement. Yet, strangely, Dr. Montoya's opinion merited the least amount of attention or discussion in the ALJ's opinion. *See* AR at 19-21. The ALJ's failure to explain her decision to adopt Dr. Montoya's opinion prevents the Court from adequately assessing whether the ALJ's RFC assessment is supported by substantial evidence. *Watkins*, 350 F.3d at 1301 (noting that, when an ALJ does not provide reason for adopting a medical source statement, the Court "cannot simply presume the ALJ applied the correct legal standards in considering [the opinion] . . . [the Court] must remand because [it] cannot meaningfully review the ALJ's determination absent findings explaining the weight assigned to the [medical opinion].")

Defendant claims that the ALJ did explain why she afforded Dr. Montoya's opinion great weight. (Doc. 28 at 10 ("[T]he ALJ did all that was required: she stated the degree of weight that she afforded [Dr. Montoya's] opinion and explained why."))[9] The Court

---

[9] Defendant actually states that the ALJ properly adopted Dr. Khan's opinion. (Doc. 28 at 10). The Court assumes he meant Dr. Montoya.

disagrees - the ALJ's decision plainly contains no explanation of her decision to adopt Dr. Montoya's opinion. The ALJ merely repeated Dr. Montoya's RFC assessment and then stated that she concurred and afforded it great weight. AR at 21.

Defendant next argues that the ALJ summarized other medical evidence in her decision which was purportedly consistent with Dr. Montoya's opinion and he urges the Court not to "divorce the ALJ's specific findings [with regard to Dr. Montoya] from the remainder of her opinion . . ." (Doc. 28 at 10). Defendant is essentially arguing that an ALJ can adopt a medical opinion without explanation so long as corroborating evidence can be found elsewhere in the record. Defendant does not cite any legal authority to support this position and the Court can find none. The Tenth Circuit has held that, while "[i]t may be possible to assemble support for [the ALJ's unexplained adoption of a medical opinion] from parts of the record cited elsewhere in the ALJ's decision . . . that is best left for the ALJ himself to do in the proceedings on remand." *Krauser v. Astrue*, 638 F.3d 1324, 1331 (10th Cir. 2011).

### c.     The ALJ Failed to Discuss all of Dr. Montoya's Findings

Mr. Hudson also claims that the ALJ erred when she adopted Dr. Montoya's RFC assessment without discussing Dr. Montoya's finding that Mr. Hudson could only work two hours a day. (Doc. 26 at 14). The Court concurs. In adopting Dr. Montoya's opinion, the ALJ referenced only her statement that Mr. Hudson could work so long as he received close supervision and only had to focus on simple tasks. AR at 21. The ALJ never acknowledged Dr. Montoya's finding that Plaintiff would be limited to two hours of work per day. By ignoring the two-hour restriction, it appears that the ALJ was selecting parts of Dr. Montoya's opinion which supported a finding of non-disability while ignoring evidence to the contrary. This is impermissible under Tenth Circuit caselaw. *See, e.g.*, *Chapo v. Astrue*,

682 F.3d 1285, 1292 (10th Cir. 2012) ("We have repeatedly held that "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability.") (*quoting Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir.2007).

Defendant claims that the ALJ rightly ignored Dr. Montoya's notation because, in his opinion, the two-hour restriction only related to Mr. Hudson's *physical* limitations. (Doc. 28 at 11). In support, he points out that the notation was made on a checklist titled "[m]edical statements regarding physical abilities and limitations for Social Security disability claim." *See* AR at 303. He therefore argues that the two-hour restriction actually had no bearing on Dr. Montoya's opinion regarding Mr. Hudson's mental health. The Court is not persuaded. None of the medical records indicate that Mr. Hudson suffers from any physical impairments and Dr. Montoya's own notes reflect that she only treated him for his schizophrenia. *Id.* In the 'comments' section of her report, Dr. Montoya specifically wrote that her findings "relate to paranoid schizophrenia and its accompanying symptoms . . . *I have no information regarding physical limitations.*" *Id.* at 304 (emphasis added). Neither is the title of the form upon which Dr. Montoya wrote her report dispositive. After all, Dr. Montoya's RFC assessment which the ALJ found so persuasive appears in the same form titled "physical abilities and limitations" and is found directly above the two-hour restriction that the ALJ ignored. *Id.* at 303. The Court can perceive no reason why the ALJ adopted Dr. Montoya's RFC assessment while ignoring the two-hour restriction except to assume that she was selectively choosing parts of Dr. Montoya's report, which constitutes legal error.

## V.   Conclusion.

The Court finds that the ALJ failed to apply the correct legal standards in adopting

Dr. Montoya's opinion and that she impermissibly highlighted evidence which supported a finding of disability while ignoring evidence to the contrary. The Court therefore **RECOMMENDS** that Mr. Hudson's *Motion to Reverse or Remand Decision of the Commissioner and Brief in Support Thereof*, (Doc. 26), be **GRANTED** and that the matter be remanded to the Commissioner for Social Security for further proceedings.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
THE HONORABLE CARMEN. E. GARZA
UNITED STATES MAGISTRATE JUDGE